IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
1/5/2023
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

| | |
|---|---|
| QUINCY B.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 6:21-CV-37 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Plaintiff Quincy B. ("Quincy") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1381f. Quincy alleges that the Administrative Law Judge ("ALJ") erred by failing to properly weigh a treating physician opinion relating to his physical and mental impairments. I conclude that substantial evidence does not support the Commissioner's decision to discount the opinion of Quincy's treating physician. Accordingly, I **GRANT in part** Quincy's Motion for Summary Judgment (Dkt. 21), **DENY** the Commissioner's Motion for Summary Judgment (Dkt. 24), and **REMAND** this case for further administrative proceedings consistent with this opinion.

## STANDARD OF REVIEW

This court's review is limited to determining whether substantial evidence supports the

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

Commissioner's conclusion that Quincy failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). "The threshold for such evidentiary sufficiency is not high," Biestek, 139 S. Ct. at 1154, and the final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d. 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted). In Mascio and Monroe, the court remanded because the ALJ

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

failed to adequately explain how he arrived at conclusions regarding the claimant's RFC. Mascio, 780 F.3d at 636, Monroe, 826 F.3d. at 189. Similarly, I find that remand is appropriate here because the ALJ's opinion fails to explain how she discounted the opinion of Quincy's treating physician.

## **CLAIM HISTORY**

Quincy filed for SSI and DIB in September 2019, claiming that his disability began on September 6, 2019. R. 272–94. Quincy's date last insured was June 30, 2023; thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 13. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Quincy's applications at the initial and reconsideration levels of administrative review. R. 82–187. On November 9, 2020, ALJ Suzette Knight held a hearing to consider Quincy's claim. R. 37–62. Counsel represented Quincy at the hearing, which included testimony from vocational expert Robert Lester. On December 14, 2020, the ALJ entered her decision analyzing Quincy's claims under the familiar five-step process[3] and denying his claim for benefits. R. 10–20.

The ALJ found that Quincy was insured at the time of the alleged disability onset and that he suffered from the severe impairments of vascular insults to the brain; chronic pancreatitis; hyperlipidemia; generalized anxiety disorder; and major depressive disorder. R. 13. The ALJ

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 13–15.  The ALJ concluded that Quincy retained the residual functional capacity ("RFC") to perform a range of light work. R. 15. Specifically, Quincy can stand/walk for a total of four hours in an eight-hour workday; occasionally push/pull with the left non-dominant upper and left lower extremities; occasionally reach overhead bilaterally; occasionally handle and finger items with the left non-dominant hand; occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally be exposed to vibration; and never be exposed to hazards, such as working at unprotected heights or around machinery with moving mechanical parts. R. 15. The ALJ also found that Quincy had the following non-exertional restrictions: able to understand, remember, and carry out short, simple instructions; can maintain concentration, persistence, and pace to perform unskilled work at a non-production pace (i.e., assembly line) in two-hour increments in order to complete an eight-hour day; occasionally interact with the public; and is able to tolerate few changes in a routine work setting. Id.

The ALJ determined that Quincy is unable to perform his past relevant work as a heavy machine operator and dump truck driver. R. 19.  However, the ALJ determined that Quincy could perform other work in the national economy, such as router, classifier, and non-postal mail clerk. R. 20. Thus, the ALJ determined that Quincy is not disabled. Id.  Quincy appealed the ALJ's decision and the Appeals Council denied his request for review on May 4, 2021. R. 1–6.

## ANALYSIS

### I.     Medical History

Quincy was 44 years old on his alleged onset date and has a history of small vessel disease and chronic lacunar infarct in the left thalamus.  In January 2020, Quincy had two

cerebrovascular accidents ("CVA") or strokes, about one week apart. R. 2018, 2148. Post-CVA, Quincy experienced expressive language deficits, word finding difficulties, and diminished insight; he required verbal cuing to follow commands; and he had decreased grip strength in the left upper extremity, a limp, and dragged his left lower extremity when walking. R. 1988–2006, 2190.

Quincy saw occupational therapist Kendra Nicholson on February 11, 2020, and noted extremity weakness and impaired mobility. R. 2148. On exam, Quincy had 3/5 shoulder flexion and abduction; 3/5 elbow flexion and abduction 3/5 wrist flexion; and 4/5 wrist abduction on the left side. R. 2148. Quincy had poor motor planning with slight ataxic movements in his left shoulder movement patterns, and used compensatory patterns for each. Quincy had difficulty tying shoes, but could zip his pants. Ms. Nicholson assessed Quincy with impaired motor planning and weakness of the left upper extremity. R. 2149.  She found that Quincy had a good prognosis as he was motivated to return to cutting hair and improve his condition. Id.

Quincy woke up feeling dizzy on February 16, 2020, and his imaging confirmed a recurrent acute pontine stroke, secondary to small vessel occlusion.  Nicole Chiota-McCullum, M.D., examined Quincy and assessed spasticity in his left upper extremity and decreased strength in his left lower extremity. R. 2130.  Dr. Chiota-McCullum resumed his antiplatelet therapy, continued high intensity statin, counseled Quincy to stop smoking, and referred him for new physical, speech and occupational therapy assessments. R. 2131.

Two days later, Quincy saw John Leiner, M.D., and complained of residual weakness in his left hand, arm and foot, difficulty with coordination, and mildly garbled speech. R. 2712. Dr. Leiner assessed type 2 diabetes mellitus, essential hypertension that is much improved, and CVA due to embolism of cerebral artery. R. 2718.  Dr. Leiner recommended continuing

aggressive risk factor modification and medications. Id.  The same day, Quincy saw Blair Anderson, PT, for difficulty walking. R. 2118. Quincy noted walking at home without an assistive device or bracing.  On exam, Quincy's gate had decreased ground clearance with occasional toe drag, hip hiking due to decreased hip flexion and knee flexion on swing phase, and knee hyper extension on stance phase on left side.  He lost his balance three times due to foot drop, and recovered by placing his hand on nearby equipment.  Mr. Anderson noted that Quincy was able to perform step ups without difficulty on a 4-inch step; his gait was ataxic with occasional toe catching; and he would benefit from continued physical therapy. Id.

On February 21, 2020, Quincy returned to Blair Anderson, PT, for difficulty walking. R. 2519. Mr. Anderson noted that Quincy's gait pattern was significantly improved with a carbon fiber ankle-foot orthosis. He still had occasional toe drag but his stride length became more symmetrical with increased stance time on the left. R. 2520.  Quincy returned to physical therapy again on February 25, 2020 (R. 2523), February 28, 2020 (R. 2529), March 2, 2020 (R. 2433), March 11, 2020 (R. 2569), and March 16, 2020 (R. 2588). On March 16, 2020, Quincy tolerated his treatment sessions with no loss of balance, but felt unsteady on his left side with single leg stance and functional reach activities. R. 2589.

On March 2, 2020, Quincy saw Keri Johnson, MSN, FNF-C, for follow up after ischemic stroke. R. 2537.  Quincy reported experiencing left arm and leg weakness and intermittent speech difficulties, but could see improvement with therapy sessions. He denied dizziness or other neurological symptoms. He remained compliant with medications and continued to smoke. R. 2538. On exam, Quincy was alert and oriented, his speech was slow and effortful with occasional stuttering, his comprehension and fund of knowledge were intact, he had normal bulk and tone, he had mild ataxia on the left on finger-to-nose testing, and a stable gait, but favored

his right leg when walking. R. 2450. Nurse Johnson reinforced the importance of compliance with antithrombotic therapy and risk factor modification, counseled Quincy on the need to stop smoking, and continued his medications. R. 2452.

On April 28, 2020, Nurse Johnson followed up with Quincy remotely, and he reported feeling well overall but continued to experience difficulty with word finding, which was evidenced during their conversation, and weakness in his left arm and leg. R. 3001. Quincy reported occasional balance difficulties, but denied falling and said that using a walker helps. His outpatient speech and physical therapy sessions were suspended due to COVID-19. Nurse Johnson continued Quincy's medication, recommended cessation of smoking, and instructed him to check his blood pressure at home 2–3 times per week. Id.

On July 15, 2020, Quincy saw Ihuoma Njoku, M.D., for passive suicidal and homicidal ideation. R. 3671. Quincy reported thinking of hurting himself, and feeling a lot of stress due to his financial situation, lack of income and three strokes this year. He noted residual weakness on his left side after the strokes and a history of chronic pancreatitis. He reported poor sleep, that his thoughts move quickly, and that he is overall generally frustrated with the world. R. 3672. Dr. Njoku noted that Quincy's mood was bad, he had a constricted affect, passive death wish, fair insight and judgment. Dr. Njoku assessed likely adjustment disorder with depressed mood given life stressors and low mood with limited supports. Dr. Njoku recommended an antidepressant and removing firearms from his home. R. 3678.

On July 28, 2020, Nurse Johnson examined Quincy and summarized the visit in a letter to Dr. Leiner. R. 2962. She reported that Quincy was hospitalized several times since his last assessment in April 2020, for abdominal pain (May and July 2020), COVID-19 diagnosis (June 2020), pancreatitis (June 2020), and suicidal ideation (July 2020). Quincy reported being

frustrated with the frequency of his hospitalizations and the lack of progress with his stroke recovery.  Nurse Johnson noted a significant improvement with Quincy's speech, but occasional trouble with word finding, particularly when stressed or fatigued. He could carry on conversations without issue.  Quincy continued to have decreased strength in his left upper and lower extremities.  He could not lift heavy objects because of weakness in his left arm and had difficulty with fine motor activities such as dressing and bathing.  Quincy's fine motor activities were further affected by numbness and tingling in his left hand. Id. Quincy continued to report difficulty with balance and intermittent dizziness; he felt like he was going to fall over and grabbed onto walls for stability. Quincy used a rolling walker when leaving his house, and was checking his blood pressure at home.

  On examination, Quincy was alert, attentive, and fully oriented. He had no evidence of aphasia, but spoke with mild dysarthria.  Quincy had normal bulk and tone in his upper and lower extremities, 4/5 strength in his left upper and lower extremity, and 4/5 left grip strength. Quincy had delayed rapid alternating and sequential movements on the left.  Nurse Johnson noted that Quincy improved following his strokes but had not fully benefited from physical therapy, occupational therapy and speech therapy due to the coronavirus pandemic. R. 2965.

  Quincy saw Physical Therapist Blair Anderson on August 19, 2020, and was able to complete a six-minute walk test without loss of balance, but required multiple standing breaks. R. 4088.  Ms. Anderson noted that Quincy needed improved function before he can safely and effectively apply for a job that is physical demanding.  She found that Quincy demonstrated ongoing weakness of the left lower extremity, resulting in unsteady gait pattern and increased risk for falls. Id.

Quincy received occupational therapy the same day with Joseph Volker, OT, and reported having multiple near falls and feeling tired all the time. R. 4078. On examination, Quincy had 3/5 shoulder flexion and abduction, 3/5 elbow flexion and abduction, 3/5 wrist flexion and extension. R. 4079. Quincy's left shoulder movement patterns had impaired motor planning with slight ataxic movements. Quincy used compensatory patterns for reaching. Mr. Volker assessed Quincy with impaired motor planning and weakness of the left upper extremity secondary to his stroke. R. 4080.

On August 25, 2020, Quincy presented to the emergency room with blurry vision, worsening of his sensorimotor deficits, headaches and lightheadedness. R. 3938. Quincy was concerned that he was having another stroke. Quincy was evaluated and found to have symptoms lateralizing to the left side of his body. Quincy's imaging results did not show evidence of acute intracranial abnormality. R. 3980.

Quincy returned to his physical therapist on August 28, 2020, and September 28, 2020, and reported that he lost his balance while sweeping and fell. R. 3899. Quincy's gait had decreased ground clearance with occasional toe dragging, hip hiking from decreased hip and knee flexion, knee hyperextension on the left side, and loss of balance due to foot drop. R. 3899, 4093. Quincy needed several seated rest breaks due to fatigue with activity, and was discharged in September due to lack of ability to progress and poor cardiac tolerance. R. 3900, 4093.

**II.     Medical Opinions**

On February 20, 2020, Dr. Leiner completed a Physical Assessment form, noting Quincy's diagnosis as CVA, diabetes and hypertension. R. 2244. Dr. Leiner found that Quincy's symptoms would constantly interfere with the attention and concentration required to perform simple work-related tasks; he would need to recline or lie down more than typical breaks in an

eight-hour workday; he can walk one city block without rest or significant pain; he can sit for two hours in an eight-hour workday; he can stand/walk for less than an hour in an eight-hour workday; and he will need unscheduled breaks every day for at least an hour. Id.  Dr. Leiner determined that Quincy can lift and carry less than 10 pounds occasionally and cannot use his left hand, fingers or arm. R. 2244. He also found that Quincy would likely be absent from work more than four times a month due to his impairments. R. 2245.

On March 9, 2020, Dr. Leiner completed a Mental Capacity Assessment of Quincy, and noted that he "has had two strokes but his mental capacity is normal. His memory, though, is poor and he requires assistance to take medications." R. 2247.  Dr. Leiner found that Quincy had moderate limitations with concentration, persistence or maintaining pace, and an extreme limitation with the ability to work a full day without needing more than the allotted number of rest periods. R. 2248. Dr. Leiner explained that Quincy "is very limited by marked weakness and deconditioning of his left hand, arms and leg.  He walks with difficulty and requires rest every 5–10 minutes." Id.  Dr. Leiner found that Quincy would have moderate limitations with adapting or managing himself, and an extreme limitation with managing his psychologically based symptoms. Id. Dr. Leiner stated that "Quincy's memory is poor.  He needs help with dressing.  His judgment and reasoning are poor.  He has extreme anxiety which is mildly helped with medication.  He is unable to focus or pay attention." Id.  Dr. Leiner found that Quincy had no limitations with the domains of interacting with others or understanding, remembering or applying information. R. 2247–49.

On June 2, 2020, state agency physician Eugene Noland, M.D., reviewed Quincy's records and determined that he could lift 20 pounds occasionally and 10 pounds frequently; stand/walk for four hours in an eight-hour workday; and sit for six hours in an eight-hour

workday. R. 101. Dr. Noland found that Quincy had limited push and/or pull in his left upper extremity and left lower extremity; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. R. 102. Quincy has limited overhead reaching on both sides, and limited handling and fingering on the left. R. 102–03. Dr. Noland noted that Quincy was expected to continue to improve following his recent CVAs. Dr. Noland noted that Quincy could walk 279 feet without an assistive device by March 2020 and was able to oppose all the digits of his left hand. He still had left upper and lower extremity weakness in April 2020 and occasional balance difficulties, but no falls. Dr. Noland concluded, "[t]he claimant does seem to be making progress and a projected RFC for limited light seems appropriate taken from the [activities of daily living]." R. 104.

On June 3, 2020, state agency psychologist Joseph Leizer, Ph.D., reviewed Quincy's records and determined that he had moderate impairments with the ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace; interact appropriately with the general public; and respond to changes in the work setting. R. 104–06. Dr. Leizer determined that despite his moderate impairments, Quincy could perform one and two step tasks, carry out short and simple instructions, maintain attention and concentration for extended periods of time, maintain socially appropriate behavior, perform personal care functions to maintain an acceptable level of personal hygiene, and meet the basic mental demands of competitive work on a sustained basis. Id.

On July 1, 2020, state agency physician Jack Hutcheson, M.D., reviewed Quincy's records and agreed with the limited light RFC suggested by Dr. Noland. R. 154–57.

On June 23, 2020, state agency psychologist Leslie Montgomery, Ph.D., reviewed Quincy's records and agreed with the moderate limitations determined by Dr. Leizer. R. 157–59. Dr. Montgomery concluded that Quincy is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments. R. 159.

### III.	ALJ Decision

The ALJ set forth Quincy's treatment history in summary fashion in her decision. R. 15–17.  The ALJ reviewed the medical opinions in the record, finding persuasive the opinions of Drs. Noland and Hutcheson that Quincy is limited to a range of light work with left extremity restrictions. R. 18.  The ALJ noted that the opinions were consistent with the medical evidence that demonstrated decreased strength in the upper and lower left extremity as well as occasional gait deficits. Id.

The ALJ also found persuasive the mental health opinions of Drs. Leizer and Montgomery that Quincy had moderate limitations in all domains of function, finding those restrictions consistent with Quincy's mental status exam findings that were generally unremarkable and his hospitalization for increased psychiatric symptoms in July 2020. Id.

The ALJ reviewed Dr. Leiner's opinions and found them less persuasive, "as apparently Dr. Leiner relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." R. 18.  The ALJ found Dr. Leiner's opinions unsupported and inconsistent with medical records documenting that Quincy no longer needed an assistive device to ambulate and was able to perform his personal care activities.  The ALJ noted that Quincy had "more than zero use" of his left lower extremity. R. 18. The ALJ found that "the record does show some medical signs and lab findings consistent with restriction to four hours of standing and walking, including

the dragging of the left lower extremity and a limp while walking." Id. The ALJ found that Quincy's 4/5 strength in his upper and lower left extremity supports a limitation to occasional handling and fingering with his left upper extremity. R. 19.

Regarding Quincy's mental limitations, the ALJ found Dr. Leiner's finding of no limitations in understanding and remembering information and interacting with others to be inconsistent with medical evidence documenting a speech deficit after Quincy's strokes and his homicidal ideations. The ALJ found Dr. Leiner's moderate to extreme limitations in maintaining concentration and managing oneself to be "wholly inconsistent" with the medical records documenting intact attention and concentration as well as Quincy's statements that he could perform activities of daily living. Id.

### IV.  Physician Opinion

Quincy asserts that the ALJ's decision fails to properly explain the weight she provided to the opinions of treating physician Dr. Leiner and is not supported by substantial evidence. I agree. Quincy filed his application in September 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions in his case.[4] When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). In evaluating the persuasiveness of medical opinions, the ALJ will consider five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict the opinion.

---

[4] 20 C.F.R. §§ 401.1520c, 416.920c applies to claims filed on or after March 27, 2017.

The most important factors considered are supportability and consistency.[5] Id.  The ALJ is not required to explain the consideration of the other three factors. Green v. Saul, No. 5:20-cv-1301-KDW, 2021 WL 1976378, at *6 (D.S.C. May 18, 2021). However, when "medical opinions or prior administrative medical findings about the same issue are equally well–supported . . . and consistent with the record," the Commissioner will articulate how he considered the following factors: the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

The Fourth Circuit reiterated in Monroe v. Colvin that an ALJ must "build an accurate and logical bridge from the evidence to his conclusion," and the failure to do so is grounds for remand. 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). "The failure of an ALJ to specify what treatment history or evidence does not support a particular opinion means 'the analysis is incomplete and precludes meaningful review.'" Knapp v. Colvin, No. 7:15-CV-348, 2016 WL 4447836, at *3 (W.D. Va. Aug. 1, 2016) (quoting Monroe, 826 F.3d at 191), report and recommendation adopted, No. 7:15-CV-00348, 2016 WL 4482419 (W.D. Va. Aug. 23, 2016). Monroe confirms the ALJ's obligation to explain the conclusions reached and identify the record evidence which supports those conclusions. Only then can a court meaningfully review whether substantial evidence supports the ALJ's decision.

Here, the ALJ provided a limited explanation as to why she gave Dr. Leiner's opinions little weight, and those explanations are not supported by the record. Specifically, the ALJ noted: 1) Dr. Leiner "apparently" relied quite heavily on Quincy's subjective report of symptoms and

---

[5] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

limitations; 2) medical records documented that Quincy no longer needed an assistive device to ambulate; 3) Quincy could perform his personal care activities; 4) Quincy's 4/5 left extremity strength support a limitation to occasional handling and fingering with his left upper extremity. R. 18.

While the ALJ provided reasons to give Dr. Leiner's opinion little weight, these reasons are not "good" or reflective of the evidence in the record. First, the ALJ does not explain or support how she determined that Dr. Leiner relied upon and uncritically accepted as true Quincy's subjective statements. This appears to be a supposition by the ALJ based upon the content of Dr. Leiner's opinions. Dr. Leiner examined and treated Quincy multiple times prior to providing his opinions. Dr. Leiner further provided explanations for his findings, for example, noting that Quincy "is very limited by marked weakness and deconditioning of his left hand, arms and leg. He walks with difficulty and requires rest every 5–10 minutes." R. 2248.

The ALJ also failed to explain how Quincy's ability to ambulate without an assistive device undermines Dr. Leiner's opinion that Quincy could stand or walk for less than one hour per day. Dr. Leiner did not refer to the need for an assistive device in his opinion. Rather, Dr. Leiner noted that Quincy walks with difficulty and requires rest every 5–10 minutes. This finding is supported throughout Quincy's treatment records, and particularly by the records of Nurse Johnson and Physical Therapist Anderson, who repeatedly note Quincy's difficulty with balance, near falls, and need for standing breaks when walking. R. 2962, 3899, 4088, 4093.

Likewise, the ALJ states that Quincy can perform personal care, but does not explain how that relates to the limitations set forth by Dr. Leiner. Quincy's providers noted his difficulty performing personal care activities such as tying his shoes (R. 2149), dressing, and bathing (R. 2962). Additionally, Quincy testified that he cannot cook meals, can only microwave food,

and does not clean or wash clothes. R. 50–53. The ALJ did not provide an explanation as to which of Quincy's personal care abilities contradicted Dr. Leiner's conclusions.

The Commissioner asserts that examples of the unsupportability and inconsistency of Dr. Leiner's opinions can be found elsewhere in the ALJ's opinion, which is to be read as a whole. Comm'r Br. Summ. J. p. 10–11. The Commissioner points to records reflecting that Quincy could walk without an assistive device, and a July 2020 examination that Quincy had normal bulk and tone in his arms and legs and 4/5 strength in his left arm. R. 3533. Although the ALJ summarily cited to these records in a truncated fashion in the opinion, she did not provide the required explanation as to how these records contradicted Dr. Leiner's opinions. The ALJ also did not explain how these records establish that Quincy can walk for four hours in an eight-hour workday, rather than Dr. Leiner's conclusion that Quincy can walk for less than one hour in an eight-hour workday.

While an ALJ is under no obligation to accept any medical opinion, he or she must explain the weight afforded to each opinion. See Monroe, 826 F.3d at 190–91. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996). The ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave" to the opinion and "the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996). If the ALJ provides a sufficient explanation, the court "must defer to the ALJ's assignments of weights unless they are not supported by substantial evidence." Dunn v. Colvin, 607 Fed. Appx. 264, 267 (4th Cir. 2015) (citing Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012)). However, if the ALJ does not adequately explain the weight given to

each medical opinion, the court cannot meaningfully review the ALJ's decision, and remand is warranted. Monroe, 826 F.3d at 190.

Here, the ALJ's explanation for discounting Dr. Leiner's opinion is insufficient and is not supported by the totality of the record, which consistently reflects Quincy's difficulty with left-sided weakness, balance, falls, toe dragging, limp, and need for frequent breaks while walking. I recognize that it is not my function to conduct a blank slate review of the evidence by reweighing conflicting evidence, determining credibility, or substituting my judgment for the ALJ's when "reasonable minds could differ." See Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012); Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). In fact, I am precluded from doing so; it is the duty of the ALJ to explain the basis for her opinion. Here, the ALJ did not adequately explain how she weighed the conflicting evidence, specifically the opinions of Dr. Leiner and the social security reviewing physicians. The ALJ did not sufficiently explain her reasoning to discount Dr. Leiner's findings such that this Court can determine whether her decision is supported by substantial evidence.

## CONCLUSION

For these reasons set forth above, I **GRANT in part** Quincy's motion for summary judgment, **DENY** the Commissioner's motion for summary judgment this case, and **REMAND** this matter to the Commissioner for additional consideration under sentence four of 42 U.S.C. § 405(g).

Entered:  January 5, 2023

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge